Case of the morning Comparelli v. Republic of Venezuela I am Rodrigo Da Silva and I have the privilege to represent the appellants Carmina Comparelli who is here with me today in the first line and the other appellant, Julio Delgado Comparelli, both of whom are Italian citizens. This appeal arises from the district court's dismissal of this action with prejudice, applying the Alien Tort Statue to their unlawful expropriation claim that arises under the Takings Exception of the Foreign Sovereign Immunities Act, specifically 28 U.S.C. 1605A3, which is a provision which was enacted by Congress to confer subject matter jurisdiction to the United States District Courts in actions involving the takings where there is a right in property at issue, taking in violation of international law, and there is a U.S. jurisdictional nexus. And there are two alternative U.S. jurisdictional nexus. The one that is present here is that the property in question is being managed or owned by Apelli Petrochimica de Venezuela, a state-owned petrochemicals company that has commercial activities in the United States, a fact that the Apellis never dispute, either in the district court level or in their briefs. Apellis rely heavily on the Supreme Court's decision in Amerada, which is a case that arose under the different exception to sovereign immunity, the tort exception, which is 1605A5. Their reliance on that case is misguided because that exception requires that the tort be committed in the United States. And in that case, the plaintiffs had a vessel bombed by the Argentine military in the South Atlantic Ocean, 5,000 miles away from the nearest U.S. shore. The Supreme Court correctly held that the tort was not committed in the United States, and therefore the exception was not applicable. Let's talk about this exception, which is either the expropriation exception or the taking exception, whatever you wish to call it. And it seems to me one of the hard issues in this case is that your clients are not just Italian citizens, right? They're essentially dual nationals. Are they not? Not, Your Honor. That's incorrect. What are they? Carmina Comparelli was born in Italy, lived until she was five or eight years old, moved to Venezuela, and she never became a Venezuelan citizen. But she's been there 54 years. She's been there for a long time. And the plaintiff is a dual national. I'm sorry? Other plaintiff that's left is a dual national. We are alleging the complaint that Julio is an Italian citizen. We believe the appellees are going beyond the four corners of the complaint. But even if that was the case, the Ninth Circuit in the Siderman case, which this court has . . . Before we get to that, I think we need to establish whether Julio is a Venezuelan citizen. I thought that was undisputed. I'll concede that Julio is a Venezuelan citizen. And he has dual passports. He has dual passports, correct. And she . . . I agree with you. She doesn't have . . . She never became a Venezuelan citizen. She's been there 54 years. Correct. So it's the nexus that we're looking for here that seems to be missing. That's what is the problem here. The properties in Venezuela, the taking occurred in Venezuela between the Venezuelan government and longtime residents and the dual national. That's the problem we're trying to get over for you. I understand, Your Honor. Applying the logic as to the residents, if a U.S. citizen moves to Venezuela and establishes a successful business and stays there for a very long time, never becomes a Venezuelan citizen, and one day his property, his company is expropriated without compensation in violation of international law, he would be entitled to come to a U.S. court and bring that case. The same thing, the restatement of foreign relations of the United States has specifically a comment that specifically provides that the taking exception allows foreign citizens. In fact, the Supreme Court in the Wellington case . . . I'm sorry, what case? The Supreme Court in the Wellington case . . . Wellington. Wellington, V-E-L-L-I-N-D-E-N, specifically held that the Foreign Sovereign Immunities Act does not limit the action based on the nationality of the plaintiff because the Congress makes sure that there was a sufficient U.S. connection, and in that case, which was brought, I believe, under commercial exception, a Dutch company versus the Central Bank of Nigeria, the Supreme Court said, we don't care that we have a foreign plaintiff here. All of those arguments were raised and were rejected by the Supreme Court taking a look at the legislative history. As I understand it, the nexus that you're relying on is in that second clause that the agency or instrumentality is engaged in a commercial activity in the United States. Correct. Because if it weren't for that, then you wouldn't have any nexus. A hundred percent correct, Your Honor. Petroquímica de Venezuela, PECIVEN, ships fertilizers almost on a biweekly basis to the United States. In fact, in the complaint, we attach a sample of some of the bills of lading of that commercial activity, and it is undisputed in the record that PECIVEN is the entity that right now manages the operation of Maribelka, which is Carmina's company, and Transven, which is Julio's company. Now, what do you do about, I use their first names, I don't mean to be colloquial about it, what do you do about Julio's claim given that he is in part a Venezuelan national? Because international law generally says that when a state takes or expropriates property of one of its own citizens, that's generally not a violation of international law. Generally. Two arguments. The Supreme Court recently in the Helmerich versus Venezuela case substantially chipped away at that domestic takings rule, because they specifically held that usually that is the case. But if there is a violation of international law, then the domestic takings rules gives away. What is a violation of international law? The lack of compensation, adequate prompt compensation, which is what we allege in our complaint. The second point I want to make. You mean that if a country takes the property of one of its own citizens, and you don't get the compensation you think you're entitled to, that violates international law? I believe so. I believe that is firmly rooted of principle of international law, customer international law, and as well as treaty law. What's the best case you have for that proposition? The best case that I have. Because I thought the law trended in the other direction. Until the Helmerich decision in May, where the Supreme Court says, usually we apply the domestic takings rule, but if there is a violation of international law, then sovereign immunity sits away. But what's the violation of international law? There are several violations of international law in this case. A sham criminal proceeding was brought, where there are violations of due process rights, the presumption of innocence, the right to present a defense, the right to have an impartial judiciary, as to the expropriation itself, the right to have compensation. And all of these rights are different violations of international law.  In this court, in the Messerhani case, reading the second Hickenlooper amendment, which also has a violation of international law provision to get rid of the state of act doctrine, provides principles of compensation. And in this court, in the Messerhani case, said, we read those violations of international law in the FSA's exception, and in the second Hickenlooper statute, consistently therewith. The other thing is that in Siderman, the 9th Circuit... Let me ask you this question. You say that the lack of adequate compensation gives you a violation of international law, right? Yes. Okay. Let's assume that in a different case, Venezuela takes the property of one of its own citizens, not a dual national, one of its own citizens, and pays that national, that Venezuelan national, $5 million for the property. And the national says, you know, my property's worth $6 million, not $5 million. Does that national have a claim under the FISA and international law? It will depend if the US jurisdictional nexus is... Assume that it does meet it. I think he may. It's a weaker case. Why is it weak? Why is it weaker? Because in this case, what we'll itch is zero compensation. No, but it shouldn't matter to you. Because if the compensation is not adequate, you've got a violation of international law according to your theory, right? I agree. In fact, yeah. So every time that a foreign national thinks that he or she has not been adequately compensated for the taking of private property, like for example, someone has to give up property because of the building of a road or a bridge, and they think that their property was worth more than the government gave them, they can file suit here as long as the requisite nexus is met. As long as the requisite nexus is met. And those are very limited. Do you have any case that stands for that proposition or even comes close to it? Well, the Siderman case of the Ninth Circuit, I think it's right on point in this case because it has been cited in other contexts approvingly by this court, and in that case there was an Argentine citizen, Susana Siderman de Blake, whose company's property in Argentina was expropriated under very similar circumstances like here, an alleged judicial proceeding and a receivership, and she later became a U.S. citizen prior to filing suit. So it was a dual citizen. It's actually worse because Julio has been an Italian citizen by application of law since he was born. Susana became a U.S. citizen, filed lawsuit, and the Ninth Circuit said, as to her, we allow her to, the claim to go through because she has a citizenship other than Argentina, even though she had dual citizen. I also cited in our papers a district court decision from the Northern District of Illinois regarding a claim against Iran, where one of the plaintiffs also became a U.S. citizen prior to filing suit, and the court said there might be subject matter jurisdiction. We don't reach it in this case because the U.S. and Iran have a treaty to deal with those expropriation claims and sovereign immunity arises from another case, but he might, as to him, the other plaintiffs that are only Iranians, no claim, but as to him that became a different citizen prior to filing suit, there might be a claim. Counsel, let me ask you about your cite to Helmrich because in your brief you cite it for the, all you have to have is a non-frivolous claim. Since that time, it did go to the Supreme Court and the unanimous opinion by Justice Breyer established a somewhat stricter standard so that, is it correct that even if we were to rule in your favor on remand, you would have to meet that standard for jurisdiction, not that you have a non-frivolous claim, but that at the jurisdictional level, that you have an actual successful claim. I agree 100% with your Honor's characterization. And really, you were sort of citing Helmrich for the proposition that any taking violated international law, but that really wasn't the pointed issue in the Supreme Court, was it? No, but one of the key points there was the application of the domestic takings rule because the Supreme Court had never applied the domestic takings rule in an FSAA case, never until that case. And in that case, they recognized the rule, but said if there is a violation of international law, sovereign immunity cedes. The last point is that as an Italian citizen, there is a treaty between Italy and the United States, which requires, which is under the supremacy clause of the United States Constitution is the Supreme Court of the land, and requires that the courts be open to Julio as an Italian citizen in the same way that they would be open to a United States citizen. And before you sit down so we can clarify, in terms of in violation of international law, are you relying on just general common law, international law, or are you relying on a particular treaty violation? Customary international law, which is evidence as far back as the... Just customary... And as well as treaties, because there is a treaty that is self-executing and binding between us to Venezuela, which is the American Convention of Human Rights, and Article 23 of that convention specifically deals with that. There is also a resolution for the General Assembly of the United Nations dealing with economic rights that specifically talks about the principle of international law that an interpretation requires the payment of compensation. Thank you. What's the provision of the convention that you just mentioned? Hold on one second, you don't know just... Article... I apologize. It's Article 21, subsection 2, which is the right to property, and... And that's the convention on human rights? Human rights, yes. And Article 2C of the UN General Assembly Resolution 3281, I believe, is a clear representation of what the international community thinks in this area of the law. And we cited many statements from former Department of State's, Secretary of Department of State's going back to 1938, talking about the principle of compensation. Those statements actually became the norm that followed through the treaties. Unless the court has any other questions, I'll restart the meeting. Mr. Robinson? Yes, Your Honor. May it please the court, Dwayne Robinson with the law firm of Hogan Lovels on behalf of Apelli Petrochemical de Venezuela. My co-appellees, Mr. Quinn Smith here, will be addressing the argument on behalf of the Republic of Venezuela, PECI event, as we're commonly known, is a sovereign instrumentality. I would just like to correct something that the Appellant's Counsel made. Judge Williams here entered two orders in this case. We focused primarily on the second order, which is the order of dismissal. That order was not with prejudice. It's right there in the docket. That was an order issued without prejudice. And there doesn't seem to be any argument here on appeal that Judge Williams was wrong to dismiss the Alien Torch Statute claim in that case. There was no reference to Kiobel or to this court's decision in Doe v. Drummond that questions the fact that where you have a foreign cube case, such as this case, where you have foreign plaintiffs, Venezuelan and Italian plaintiffs, who are complaining about the expropriation of their Venezuelan companies in Venezuela by Venezuelan sovereigns, that that is outside the jurisdiction of the United States. There's just simply no argument about that. As to the first order in the case, the other order of appeal, is the interlocutory order on the motion for leave to amend. In that situation, Judge Williams did not say the plaintiffs have no outright, no right to file an amendment complaint in this case. She simply said, not right now. We have a pending motion to dismiss. Let's decide that at this moment. After Judge Williams dismissed the initial complaint without prejudice, the appellants, the plaintiffs, never filed the motion for leave to amend. Instead, they made the strategic choice to come to this court and to complain that Judge Williams never gave them a right for leave to amend. And then they sought to remove Judge Williams from the case. I thought there was an amended complaint that was attemptedly filed. It was, Your Honor. And that was the interlocutory order, which Judge Williams had in her discretion the right to say, not right now. No, I know. But you're suggesting that they never tried to file an amended complaint, and I think the record is otherwise. It may not have been legally appropriate, but it's not like they sat back and never tried to submit something. I thought the problem was they were beyond the time for automatic amendment. That says to the initial interlocutory order that was entered prior to the dismissal order. So to get the timeline here, Your Honor, we filed the motion to dismiss Peck, Evand, and Republic. After the deadline to move to file an amended complaint without leave, the plaintiffs submitted an amended complaint without moving for leave. They filed the motion after the fact, and Judge Williams said, that's denied. Okay? And then Judge Williams decided to undertake the merits of the initial motion to dismiss. And our point here is, Your Honor. With the initial complaint. With the initial complaint, that's right. And my point here is, Your Honor, is that at that point, she denied the motion, I'm sorry, she granted the motion without prejudice. They had every right to go and tell the court the reasons why this new amended complaint should be heard. But they didn't do that. They strategically decided, we're not going to try to resolve this case. We're going to go to the 11th Circuit and complain that our rights were denied because we didn't have leave. Counsel, help me here then. Maybe I'm messing up with the documents. I've been working with document 75, what it says at the top. Order granting defendant's motion to dismiss, and dismissing and closing case. And I didn't see anything about without prejudice in that order. So is there a different order I should have been looking at? I believe that's the order, Your Honor, but I think that I'm correct that that order was without prejudice. It actually would be error for it to have been with prejudice because it was a decision based on subject matter jurisdiction, which could not have possibly been with a prejudiced decision. And we think, Your Honor, that you... Maybe I'm just misreading it, so when you get a chance, you or your co-counsel might point me to the words without prejudice. It's possible I'm missing them. And even so, Your Honor... It doesn't have it. You may be thinking that because it doesn't say with prejudice, but the rule is because it doesn't say without, it is with prejudice. The language is not there. We'll check that, Your Honor. Our co-counsel... I got it here, too. It's just dismissed. It doesn't say without prejudice, so it is with prejudice. But even so, even in the authorities that the appellant cite... I don't know what it matters. I don't think it does matter, Your Honor, because even if it were with prejudice, even if the case were closed, they had the right to move to vacate the order to show why what Judge Williams did was wrong, and they never did that. And in fact, we briefed before Judge Williams why their action on the Foreign Sovereign Immunities Act was barred under the FSIA, because the FSIA simply does not have extraterritorial effect. And the appellants put forth no arguments to Judge Williams as to why that was the case. Okay, so go ahead with your argument why you say the FSIA has no extraterritorial effect whatsoever. That is, for example, the part about the nexus is that the instrumentality is engaged in a commercial activity. Does that not count as territorial as opposed to extraterritorial, or what's your argument? Absolutely, Your Honor. To correct the record, we do object, Pekivan and the Republic do object to the commercial activity nexus being met. We did that before Judge Williams, and it's actually in our appellant's brief to this court. So that's another instance where the appellants are not being forthright in the record. We have to begin with the starting point here, Your Honor, that Pekivan is entitled to sovereign immunity, at least a presumption of sovereign immunity. And it's the appellant's burden to show that that presumption has been overcome, and then they have a second burden, Your Honor, and that's to show that the burden against the extraterritorial effect of United States statutes outside the United States, that that burden has been overcome. Congress has said that you need clearly expressed intent. What they have argued is this nexus component shows that this is the only requirement to the United States. But that's not what this court said in Messerhain, and let me talk about that briefly. The appellants have gone through a number of alleged violations of international law that they want to litigate under U.S. treaties, issues dealing with their arrests, with search warrants, with due process. But this court in Messerhain said that we have to limit sort of the violations of international law to strictly those listed in the FSIA. And the reason why the court said that is because if we don't do that, then we run the risk that cases with little to no nexus to United States will be brought in our courts. Now, if the plaintiffs are right that the only nexus required is probably being in the United States or a commercial activity, then what the 11th Circuit said, which is biding precedent, is wrong. And that's simply not the case. What the appellants want this court to do is to make an inference, is to make an inference that because there's references to United States in the FSIA exception, that... But what do you think the nexus is under the FSIA's expropriation exception? Well, it's, I don't think, I'm not being clear, Your Honor. We don't disagree about what the nexus is that are laid out. What we're saying is that those nexus, that they don't apply when you're dealing with a case that's a foreign cube case, that has no relation to United States. The United States Supreme Court said in the Morrison case that Congress is concerned with domestic affairs, domestic conditions. This is a foreign cube case where we have foreign plaintiffs, foreign defendants... The FSIA and the takings exception, which begins, a foreign state shall not be immune in any case, which seems to be a sort of four corners. If you fit within that, and I understand you argue that, we can get to that. If you fit within that language in the statute, that's what Congress has said. Well, no, because we have to apply the presumption. In other words, you have to read within that language the idea that Congress was concerned with domestic affairs, domestic conditions. If you look through the legislative history of the FSIA, or the related second Hickenlooper amendment, you'll see what Congress is concerned about are United States assets. But aren't those things that Congress could have put in the statute, that it could have said with a United States citizen, or with United States property, and it used the words that it used? Your Honor, I see my time has run out. Can I please answer your question? That's ... I think he's a friend of you, Judge Hall. Go ahead. Of course. That's an excellent ... I was reading 1605A3 exception. I was reading the language of the exception. Go ahead. Go ahead. That's an excellent question, Judge Boggs, and what the Supreme Court has said, though, is that Congress doesn't need to use those words, that Congress is presumed to be applying the law as United States conditions. What's the case that you said the Supreme Court has said? Where did they say that? Well, the Supreme Court has said repeatedly, in Morrison, in Kiobel, as recently NGR Nabisco, that there's a presumption that United States law concerns the territory of the United States, but the Morrison case ... Well, Kiobel's about the Alien Tort Statute, isn't it? It is about the Alien Tort Statute, but it applied ... the Supreme Court in that case applied the presumption we're talking about. I know, but I think what Judge Boggs is trying to get you to talk about is the fact that this statute, unlike the ATS, begins with a foreign entity, a foreign country, says that they're generally entitled to immunity, and then provides exceptions. How could that not have been, if you meet the exception, and I know it's a hard thing to do, if you meet the exception, how can you say that Congress didn't contemplate bringing in a foreign national or a foreign national entity into the United States for suit? That's not my point, and I apologize for not being clear. I thought you said that the FSIA has no extraterritorial application. Where there's not United States domestic conditions at issue. So what I mean by that, Your Honor, to give another example ... Isn't there ... Okay, let's take Venezuela out of this. Let's use another country, okay? Let's use Canada. Let's say that a French citizen buys property in Canada, and the Canadian government decides it's just going to take the property, not provide any compensation, and then use the proceeds of that taking to then engage in commercial activity in the United States. Putting aside the FISA, is that a violation of customary international law? That would be, Your Honor, yes. You're telling me that that French citizen, in that scenario, cannot seek to apply the expropriation exception of the FISA to the Canadian government here? No, Your Honor, and here's why. The presumption is that the United States Congress is concerned with domestic affairs. What your argument assumes, Your Honor, is that when Congress passed the Foreign Sovereign Immunities Act, it had in mind of creating a jurisdiction or open court to the United States where Judge Williams and Judge Scola and Judge Huck would basically take on every expropriation that occurred throughout the world, even if it didn't involve U.S. citizens, didn't involve takings in the United States, or anything else, and resolve those issues. The presumption against extraterritoriality says no. Tell me how you expect that a foreign government is going to take property in the United States. Well, it's happened before in two instances, Your Honor. For instance, in this court's Maltina decision, you had the government of Cuba that expropriated the assets of a company, one of those assets being a trademark, and that trademark was cited in the United States. So that's one instance. Another instance is the United States v. Belmont. That's not an expropriation in the United ... It has an effect in the United States, but it's not done in the United States. Well, what I'm saying is that's ... But that's one instance, Your Honor, where courts have recognized extraterritorial effect, where there's effects in the United States. And I'll give you another instance. That would come under the first of the two nexuses, right? It would be property present in the United States. Yes, but that goes to Judge Jordan's question about how could you have expropriation in the United States. Okay, I agree it could be, but it doesn't make the second nexus go away. And again, I would point the court, again, to the Kiobel decision, because there the Supreme Court was presented with this idea that United States courts resolve all these international disputes. And what the Supreme Court there was hesitant. They were hesitant to opening up the doors of the United States to resolve all the world's problems. And they said, we don't have an instance where Congress has said that they've decided the United States is a uniquely fit forum to decide all the international violations that happen. And so in your situation, Judge Jordan, I think it's correct that Congress did have contemplated that you would have expropriations that occurred overseas that would be litigated in the United States, but they were concerned about United States citizens and United States investments. This is a- I know, but the statute doesn't say that at all. That's why there's a presumption is there, Your Honor. No, you're now talking about a citizenship-based statute as opposed to a presumption against extraterritoriality. And those two things are very different. I disagree, Your Honor. I think that, again, if you look at the Morrison case, just a brief- If you have an American citizen in Venezuela whose property is taken, isn't that extraterritorial? Well, no, not in the sense that- Of course it is. It has an effect on the citizen because he or she is a national of the United States. And it affects- But the taking occurs extraterritorially, doesn't it not? It does. But if I can talk briefly, Your Honor, about the Morrison case, because this is an example where the statutes of the United States don't- All the conduct doesn't have to happen in the United States. That's just a- And I give an example- You're talking about two very different statutes. I agree, Your Honor. Two very different statutes, one of which deals exclusively with the immunity given to foreign governments, and the other one which says nothing about extraterritorial effect. Your Honor, the presumption against extraterritoriality does not require that all conduct occur outside the United States. It's the focus of Congress that must occur in the United States. And what Peck even contends, Your Honor, is that the focus of Congress, of the FSIA, is to protect United States citizens and United States interests. It's the same way as- Counsel, do you have any view about the U.S.-Italian treaty, about the courts of both countries being open, whether that has any bearing at all? Because I was thinking, you know, if Venezuela expropriates an Italian citizen and puts the money in Italy, would that be a way to avoid any jurisdiction anywhere? I mean, does that treaty that he referred to make any difference at all? It doesn't, Your Honor. First of all, regarding Julio Delgado. There was an allegation in the complaint that he was an Italian citizen. The Republic put forth evidence that he's actually a Venezuelan citizen. That evidence has been rebutted. So as the trend bends, this is domestic taking. I would encourage the court to look at the Supreme Court's Helmholtz decision in May. It does not at all undercut the domestic takings rule that this court has upheld repeatedly. And secondly, no one is denying Ms. Carmina the right to bring a citizen to the United States. The question is whether the substantive provisions of the act apply to conduct that's not related to the United States. And let me tell you the danger here, Your Honors. The danger here with ruling that the United States courts are open for business is that you may have United States companies that are hauled over to Saudi Arabia to account for alleged violations of international law that occurred in Mozambique with citizens of another country. And that's the risk. That was the concern that the court had in Kiobo, why we said we're going to apply the presumption. And here, there's nothing at all that touches the United States. This is a foreign cube case last year. It's a foreign cube case today. It'll be a foreign cube case tomorrow. And lastly, they didn't give these arguments to Judge Williams. It's unfair to reverse Judge Williams where they did not make any of these arguments below. I'd encourage the court to look at the record. We move to dismiss on both complaints. They had an opportunity to respond and tell the court why the FSIA was different. They didn't say that. And for that reason, Your Honor, we request that you affirm Judge Williams' orders below. Thank you. Mr. Smith. Good morning, Your Honors. I'm going to try to not speak over what Duane has already ably argued. But I think it is important to first start off by recognizing that when we talk about 1605A3, you're talking about the stricken amended complaint. You're talking about the what? The stricken amended complaint. The original complaint is an ATS complaint. But part of their argument on appeal is that that complaint shouldn't have been stricken. Yes, I understand, Your Honor. Right. So we have that issue before us. In the context of that argument, you have to look at that stricken complaint. I agree with you. But for the purposes of just keeping it separate to the extent that the appellants are able to overcome the fact that the complaint was properly stricken, that's the only way we get to 1605A3. There was a bit of a discussion regarding a violation of international law. And there was the assertion made that it was merely the lack of compensation that would create a claim. We were quite clear, both below and in our brief here, and the Garb case is quite clear that it's not just compensation. There are, you have to first show rights and issue. There are no rights and issue that have been shown here. We're talking only about assets of a company. We're not talking about the individual's assets. What do you mean rights and issue? I don't understand. Absolutely. I don't know. I just don't understand what you mean in this context. If the New York Times owns things, that's not somebody's rights? No, we're talking about property rights. That's what I mean. Are you saying property rights are not rights or that a corporation has no rights? I'm saying that they are rights. Okay. But that the plaintiff has to show what those property rights are that actually apply. In this case, the only things that have been temporarily managed, as Judge Williams used it, under the stewardship of Pekivan, are the assets of the company. The Comparellis have no assets that have been administered by Pekivan. The rights and issue . . . Isn't that an argument then that you can take anything from a corporation and it doesn't take anything from people? Or are you saying they don't really . . . they never owned the corporation? That would be a different argument. Saying that they could have brought a claim for an expropriation of shareholder rights, for example, the shares, but the shares weren't taken. There has to be a distinction. It can't just be whatever might possibly flow up to the shareholders. There's corporate law, and corporate law is quite clear. The assets of the company are owned by the company. Marivelka, the Venezuelan company, doesn't have a claim because it's a Venezuelan company. Does that mean they should have brought the claim in the name of the corporation? And then we'd be talking about the nationality of the corporation? Exactly. Is that where you're trying to go? And that would mean that this court has no jurisdiction because it's a Venezuelan company. So going to the individuals is a way to sneak out of corporate law. Corporate law is quite clear on theirs. Now I see the point, at least. Exactly. So the rights and issue is important. We can't just talk merely about compensation. So is that just a pleading problem? That is, they should have said that we as individuals, or I as in Ms. Carmina as an individual, owns these shares. And your defense is then, yes, we took all your property, but we didn't take your shares. There's actually two points to that. And I'll get to the taken part next. But when we talk about the pleading issue, Composite Exhibit 10 is attached to the complaint. And according to the complaint, that contains the property that was allegedly taken. So this isn't a pleading issue. The plaintiffs have already said this is what we're complaining about, assets of the company. So it isn't just pleading. It goes to the core of the entire complaint. When we move on to that, taken or not taken, this is a temporary receivership order. I heard a mention in the appellant's argument that Marivelka has been managed or owned. But that's a distinction with a difference. You can't just sort of guess at that. It has to actually be taken. Nothing has been actually taken. It's in a receivership proceeding. Excuse me. What did the initial complaint allege about the ownership of Marivelka? The initial complaint that there were four owners? Correct. That is correct. And we highlighted that. And that's one of the things, amongst many others, that led to the stricken amended complaint. Because there was this attempt to move it from four to one, even though that was inconsistent with prior proceedings that related to this matter, and inconsistent just with notions of the fact that you have four shareholders in a company. It's not complicated to know who owns what shares. According to the first amended complaint, what was the percentage ownership of the four, if you remember? The original complaint is 25-25-25. The first stricken amended complaint... 25 times four? Correct. The stricken amended complaint would have been 100% Carmina, which is quite convenient because she's the one that claims that she's not actually Venezuelan, even though she's lived there her whole life and it's her beloved Venezuela. Part of the reason why these things can't be taken at face value, they're not pleading errors. They're errors that go to the core of the complaint. Did the district court ever pass on... Because the district court was certainly allowed to take evidence, although the latest Supreme Court case says that it didn't have to go as far as to figure out who owned what. Did the district court ever make any findings or reach any conclusions with regards to ownership, or it took the first amended complaint at face value? The district court merely just noted the differences. Perhaps that informed the district court's decision on striking the amended complaint, the fact that things were changing so quickly, the plaintiffs played so fast and loose with the facts. Well, they didn't amend to January of 16. I mean, there was a substantial delay before the amendment was filed or sought to be filed. Yes, Your Honor. I want to go back to taking in violation of international law. Whether right or wrong, maybe I'm totally missing, because I'm looking for a very narrow ground here of affirmance. And I thought our precedent was pretty clear under judicial-made doctrines that we're not going to say it's in violation of international law when it's a foreign taking their own citizens' property. Now, if it's taking an alien's property, that's another thing. But if Venezuela takes property of its own citizens, that is not in violation of international law. That's correct. Okay, so... I did hear your co-counsel. I'm sorry. Yeah, I'm just trying to look at what our precedent has said in that regard in both Sosa and the United States Supreme Court case back in 2004. Yes. That's the nexus. Is that not still the law? You need to be candid, because I'm going to go read all this. That we still, whether it's judicial-made, even with all these exceptions, whether it's even if we hear on not just ATS, but we're here under the amended complaint. Let's assume we're here under that amended complaint, or somehow we send it back on that amended complaint. The bottom line is it's not in violation... They can't show, and Breyer's now said, you've got to show a clear violation of international law, undisputed violation of international law, that this is not a violation of international law when you've always got that prong, when they take it, their own citizens. Right. Am I misapprehending something about that rule? That is the rule, Your Honor. Okay. That's the act-of-state doctrine.  But then as I heard your co-counsel, when we asked Judge Jordan, asked the hypothetical about Canada expropriates the Frenchman's property, I heard him say that, yes, that would be a violation of customary international law. That's on the substance. That's not... When I heard the answer to that, I took that as that that would not give rise to a claim in the United States. Well, that's jurisdictional. That's the procedural hook. I was looking to the legal part of it. In other words, as I heard Judge Hall saying, if you expropriate your own nationals, that's not a violation... It's an act-of-state doctrine. It's not a violation of international law. I heard Judge Jordan's question, and that's why I'm bringing it up, was that as a matter of substantive international law, it would be a violation or... And he used the term customary international law for Canada to expropriate the French citizen. Now, whether you can get into U.S. courts is a completely different question. But with respect to this distinction about it's not even a violation to expropriate your own nationals, I was just confirming that we'd heard that to expropriate somebody else's nationals would be a violation of customary international law, if you meet all the substantive requirements. Exactly. It could potentially. And before, without wanting to wade off into what public international law says regarding expropriation and the public purpose doctrine and all these various things, yes, that's possible. That's all I wanted, was to make that distinction, that we've still got to get them into U.S. courts, or they have to get into U.S. courts, and you may well keep them out. Okay. Which Venezuela has done quite often. I know that my time is over. If I may, Judge Hull, you referenced Helmerich. And just to be clear on Helmerich, this wasn't the first time to recognize a 1605A3 claim in the United States. It was really a case about a pleading standard, and I think that you clearly articulated it. And your time has expired. I know, and I just apologize for that. We understand. Mr. DaSilva, you reserve two minutes. The first point I really want to stress is that the Helmerich decision, the Supreme Court, in a response to their notice of supplemental authority, I quoted language, to be sure, and it was a unanimous decision of the Supreme Court, to be sure, there are fair arguments to be made that a sovereign staking of its own national property sometimes amounts to an expropriation that violates international law. And the expropriation exception provides that the general principle of immunity for these otherwise public acts should give away. If that's not chipping at the domestic takings rule, I don't know what other language could they have used. The other point is that an expropriation is a sovereign act by definition. It will always happen outside the United States unless there is a very limited example of some sort of intangible. In Verlinden, the Supreme Court, addressing these issues when the plaintiff was a Dutch company against the Central Bank of Nigeria, the Supreme Court reviewed the legislative history of the FSAA and specifically said the following. Notwithstanding this reference to our citizens in the House report, we conclude that when considered as a whole, the legislative history reveals an intent not to limit the jurisdiction under the Act to actions brought by American citizens. Congress was aware of the concern that our courts might be turned into small international courts of claims, open to all corners to litigate any dispute which any private party might have with a foreign state anywhere in the world. Testimony of Bruno Ristau in the hearings at the House. As the language of the statute reveals, Congress protected against this danger not only by restricting the class of potential plaintiffs but rather by enacting substantive provisions requiring some form of substantial contact with the United States, C-28 U.S.C. 1605. And what case are you quoting? This is the Verlinden versus Central Bank of Nigeria. This is Verlinden again. Okay, thank you. If an action satisfies the substantive standards of the Act, the Foreign Sovereign Immunities Act, it might be brought in federal court regardless of the citizenship of the plaintiff. Now, as far as the equity ownership of the plaintiffs, the original complaint had an exhibit that specifically provided Carmina was the 100% shareholder. I made a mistake in my office because I look at corporate documents that were old. Ten or 15 months prior to the acts in question, the transfer of ownership had happened for reasons completely unrelated to what would come ten months later. And that's one of the key reasons why I amended the complaint. I have a duty as an officer of the court to remediate a fact allegation because the amended complaint doesn't bring any new theories of liability, no additional damages. It's only to correct a factual allegation, which partially, there is case law that an exhibit to the complaint supersedes. So technically, the original complaint was not wrong on that issue. So you're saying there was an exhibit attached to the initial complaint that showed that Carmina owned 100% of Maribelka? Correct. When the government officials come to Maribelka's offices, she signs a document that says, I sign as a 100% shareholder of Maribelka. I'm out of time. I'm really out of time. The last point is that Judge Williams considered the amended complaint in her order because she said the dismissal is with prejudice. Even if I considered the stricken amended complaint, I would still reach the same result. Thank you, Mr. DaSilva. The case is submitted. We will be in recess.